# United States Court of Appeals

## For the First Circuit

No. 11-1718

UNITED STATES OF AMERICA,

v.

CAROLYN KRAVETZ and BORIS LEVITIN,

Defendants, Appellees.

JIM EDWARDS,

Movant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro,  U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Jeremy Kutner, Yale Law School, Media Freedom & Information Clinic, with whom Douglas Curtis, Eliza M. Scheibel and Wilmer Cutler Pickering Hale and Dorr LLP were on brief, for appellant.
Robert L. Peabody, with whom Collora LLP was on brief, for appellee Boris Levitin.
Joseph J. Balliro, Sr., with whom Balliro & Mondano was on brief, for appellee Carolyn Kravetz.
Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for the United States.

January 30, 2013

**HOWARD**, **Circuit Judge**.  Jim Edwards, a journalist, appeals from an order of the district court declining his request to make public various documents filed under seal in a criminal case.  For the reasons set forth below, we vacate in part and remand.

## I.

In 2008, a federal grand jury indicted co-defendants Carolyn Kravetz and Boris Levitin on charges stemming from a scheme to defraud restaurant franchisor Dunkin' Brands Incorporated ("Dunkin' Brands").  As charged in the indictment, Kravetz, a former Director of External Communications for Dunkin' Brands, agreed to steer Dunkin' Brands' business to Levitin's graphics firm in return for kickbacks of one-half of the gross receipts.  Kravetz then authorized payments from Dunkin' Brands to Levitin's firm, including payment in full for multiple projects on which Levitin performed no work.  Over the course of the scheme, the pair was alleged to have defrauded Dunkin' Brands of nearly $400,000.

Kravetz and Levitin pled guilty in February 2010. Kravetz's plea agreement stipulated that in exchange for her plea, the government would recommend a thirty-two month incarcerative sentence.  Levitin's agreement stated that the government would recommend a sentence at the low end of the Sentencing Guidelines range, which resulted in a recommended term of eighteen months' imprisonment. Ultimately, the judge rejected these recommendations

and sentenced both Kravetz and Levitin to thirty-two months of probation only.

The proceedings piqued the interest of Edwards, who specializes in coverage of the advertising industry for Bnet.com, a news website operated by CBS Interactive. Edwards regularly reports on events affecting major advertising firms, with a focus on stories involving corruption. He began covering the Kravetz and Levitin proceedings as early as October 2009. Citing Kravetz's former prominence in the public relations and advertising industries and references in the pleadings to additional victims of Kravetz's and Levitin's fraud, Edwards wrote periodic updates on the case and investigated the possible broader scope of the underlying scheme.

As he monitored the proceedings, Edwards noticed sealed documents appearing on the district court docket. After the court and the parties referred to Kravetz's sealed sentencing memorandum and attached letters of support during her July 2010 public sentencing hearing, Edwards sent a letter to the district court in October, requesting access to the sealed documents. At Levitin's public sentencing hearing in November, the court and the parties again made references to a sentencing memorandum and letters of support that were not available to the public.

After the entry of final judgment against both defendants, the court requested the parties to address whether the

-4-

documents sought by Edwards should remain under seal. When none of the parties responded, Edwards again moved for unsealing. The court directed counsel to respond to Edwards' request within fourteen days. When the parties again failed to respond, Edwards filed a third motion and a proposed order.

In response, Kravetz submitted a two-sentence letter opposing the motion to unseal. The body of that letter stated, in its entirety: "The defendant, Carolyn Kravetz[,] respectfully objects to the motion to unseal the file in the above-referenced matter. In support thereof the defendant says the file contains matters that are personal to her and it would be inappropriate and unreasonably detrimental to permit a journalist to access the file." Levitin did not respond to Edwards' filings.

The court denied Edwards' motion to unseal in an order stating:

> Petitioner Jim Edwards has requested that the sealed documents in this action be unsealed. Counsel for Defendant Carolyn Kravetz has opposed Petitioner's motions on Kravetz's behalf. The court has reviewed the documents in question and is persuaded from that review that the documents contain matters that are predominantly personal to Kravetz and that there is not apparent justification for their general publication. Therefore, the papers shall remain sealed.

Although the order appeared to address only the Kravetz documents, the parties do not dispute that the effect of the order was to also deny Edwards' request to unseal documents pertaining to Levitin.

Edwards appealed and simultaneously submitted to the district court a motion to intervene and an accompanying memorandum, in which he elaborated that the sealed documents were "judicial documents" to which he had a right of access under the First Amendment and common law.  Kravetz opposed the motion, arguing that "[t]here are no documents that could be considered presumptively accessible to Mr. Edwards" and that, in any event, the contested documents "contain very personal information about Ms. Krav[e]tz to which she has a presumptive and absolute right of privacy."  Edwards' motion to intervene remains pending in the district court.

## II.

"Courts have long recognized 'that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system.'"  In re Providence Journal, 293 F.3d 1, 9 (1st Cir. 2002) (quoting Siedle v. Putnam Inv., Inc., 147 F.3d 7, 10 (1st Cir. 1998)).  This recognition is embodied in two related but distinct presumptions of public access to judicial proceedings and records:  a common-law right of access to "judicial documents," and a First Amendment right of access to certain criminal proceedings and materials submitted therein.  See id. at 9-10.

Edwards argues that the district court's refusal to release the sealed documents in this case contravenes both the

First Amendment and the common law, claiming that the documents are presumptively public and that the district court failed to adhere to procedural requirements. These claims require that we determine first whether a presumption of public access attaches to the contested documents and then, if so, whether the district court's refusal to unseal those documents was sound.

## A. PRESUMPTION OF PUBLIC ACCESS

On appeal, Edwards challenges the non-disclosure of three categories of documents: the defendants' sentencing memoranda; sentencing letters submitted by third parties on the defendants' behalf and attached as exhibits to the sentencing memoranda or sent directly to the district court; and pre-trial subpoenas duces tecum and related motions filed by Levitin during the course of pre-trial proceedings pursuant to Federal Rule of Criminal Procedure 17(c).[1]

We conclude that the Rule 17(c) materials are not entitled to a presumption of access under either the First Amendment or the common law. We also conclude, however, that the public availability of the sentencing memoranda and letters must be determined using a more searching standard under the common law right of access than the district court's standard. In light of that conclusion, we decline to reach Edwards' constitutional claim

---

[1] Edwards does not seek access to the defendants' pre-sentence investigation reports, nor does this case require us to consider the status of sentencing letters attached to such reports.

as to these documents.  See generally Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 341 (1936) (Brandeis, J., concurring).

## 1.  Rule 17(c) Materials[2]

Edwards claims a right of access to the Rule 17(c) pre-trial subpoenas duces tecum and related documents filed by Levitin.[3]  The scope of the public's presumptive right of access to this category of documents appears to be a matter of first impression among the circuits.  In the district courts, this issue has most frequently been mentioned in the context of debates over the propriety of ex parte applications to the court to issue such subpoenas, with a number of courts suggesting that the public's right of access is implicated by such applications.  See United States v. Peters, No. 03-CR-211S, 2007 WL 4105671, at *1 (W.D.N.Y.

---

[2] Rule 17(c)(1) provides:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates.  The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence.  When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c)(1).  The rule thus contemplates subpoenas duces tecum returnable either at or prior to trial.  It is the latter category that is at issue here.

[3] The additional documents included a stipulation between Levitin and the government regarding the filing of ex parte motions for the issuance of Rule 17(c) subpoenas; Levitin's application to seal a subpoena request; and a motion to enforce a Rule 17(c) subpoena.

-8-

Nov. 14, 2007); <u>United States</u> v. <u>Daniels</u>, 95 F. Supp. 2d 1160, 1163 (D. Kan. 2000); <u>United States</u> v. <u>Beckford</u>, 964 F. Supp. 1010, 1029-30 (E.D. Va. 1997); <u>United States</u> v. <u>Hart</u>, 826 F. Supp. 380, 382 (D. Colo. 1993); <u>United States</u> v. <u>Urlacher</u>, 136 F.R.D. 550, 556-58 (W.D.N.Y. 1991).[4]   Beyond citation to a "trend" in favor of recognizing a presumptive right of access to documents filed in conjunction with pretrial criminal proceedings not related to discovery, however, these decisions offer little explanation as to why Rule 17(c) subpoenas should be considered presumptively accessible by the public, and at least one court has suggested that they should not be.  <u>See</u> <u>United States</u> v. <u>Tomison</u>, 969 F. Supp. 587, 595 (E.D. Cal. 1997).

We base our assessment of whether there is a First Amendment right of public access to Rule 17(c) subpoenas on experience and logic.  <u>See</u> <u>Press-Enterprise Co.</u> v. <u>Superior Court</u>, 478 U.S. 1, 8-9 (1986) (explaining that in determining whether a First Amendment right of access attaches to a particular type of proceeding or document, courts should consider two complementary considerations:  "whether [they] have historically been open to the press and general public" (the "experience" prong), and "whether public access plays a significant positive role in the functioning

---

[4] The text of Rule 17(c) does not expressly prohibit ex parte requests for subpoenas, and courts have found them to be permissible.  <u>See</u> <u>Peters</u>, 2007 WL 4105671, at *1; <u>Daniels</u>, 95 F. Supp. 2d at 1162-63; <u>Beckford</u>, 964 F. Supp. at 1025-31.

of the particular process in question" (the "logic" prong)).[5]

Neither prong is satisfied here. With respect to experience, there is no tradition of access to criminal discovery. To the contrary, "[d]iscovery, whether civil or criminal, is essentially a private process because the litigants and the courts assume that the sole purpose of discovery is to assist trial preparation." United States v. Anderson, 799 F.2d 1438, 1441 (11th Cir. 1986); see also Tomison, 969 F. Supp. at 595 ("Given that this is pre-trial production process, it hardly fits as an historically open proceeding.").

As for logic, there is scant value and considerable danger in a rule that could result in requiring counsel for a criminal defendant to prematurely expose trial strategy to public scrutiny. Accordingly, we agree with those courts that have found that public access has little positive role in the criminal discovery process. See Anderson, 799 F.2d at 1140-41; United States v. Martin, 38 F. Supp. 2d 698, 705 (C.D. Ill. 1999), rev'd on other grounds by United States v. Ladd, 218 F.3d 701 (7th Cir. 2000); United States v. Hipp, No. 2:96-801, 1997 U.S. Dist. LEXIS 24115, at *3-4 (D.S.C. Jan. 2, 1997); State ex rel. WHIO-TV-7 v.

---

[5] In In re Boston Herald, Inc., 321 F.3d 174, 182 (1st Cir. 2003), we expressed skepticism that these considerations should be treated as a two-pronged test with dual elements that must both be satisfied in order for a First Amendment right of access to attach. Here, as there, we find it unnecessary to reach the issue because we find that neither element is satisfied.

Lowe, 673 N.E.2d 1360, 1364 (Ohio 1997). Those decisions are grounded largely on concerns surrounding the deleterious effect that public access would have on the parties' search for and exchange of information in the discovery process. See, e.g., Anderson, 799 F.2d at 1441 ("If . . . [criminal] discovery information and discovery orders were readily available to the public and the press, the consequences to the smooth functioning of the discovery process would be severe."). Such considerations militate decisively against public access to criminal discovery materials. Moreover, "[m]aterials submitted to a court for its consideration of a discovery motion are actually one step further removed in public concern from the trial process than the discovery materials themselves." Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir. 1986). There is no First Amendment right of public access to the subpoenas or related materials.

When considering whether the common law right of access applies, the cases turn on whether the documents that are sought constitute "judicial records." Such records are those "materials on which a court relies in determining the litigants' substantive rights." In re Providence Journal, 293 F.3d at 9-10 (quoting Anderson, 805 F.2d at 13). Such materials are distinguished from those that "relate[] merely to the judge's role in management of the trial" and therefore "'play no role in the adjudication process.'" In re Boston Herald, Inc., 321 F.3d 174, 189 (1st Cir.

-11-

2003) (quoting F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987)).

Here the district court's review and disposition of Levitin's Rule 17(c) requests were not undertaken "in order to dispose of any issue as to the elements of the criminal charges against him." Id. Rather, and in contrast to the various types of pre-trial criminal proceedings and documents to which courts have recognized a common law or constitutional right of access,[6] Rule 17(c) materials relate merely to the judge's trial management role. Id.; see also United States v. Nixon, 418 U.S. 683, 698-99 (1974) (explaining that the "chief innovation" of Rule 17(c) was "to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials" (citing Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951))). Rule 17(c) subpoenas and related materials thus are not those relied on to determine the litigants' substantive rights.[7] Anderson, 805 F.2d at 13. Indeed,

_____

[6] The courts of appeals have recognized a right of access to various pre-trial proceedings and the documents filed in regard to them, including, for example, suppression, due process, entrapment, and plea hearings. See In re Hearst Newspapers, L.L.C., 641 F.3d 168, 176 (5th Cir. 2011) (collecting cases).

[7] It has been suggested that a trial court's disposition of Rule 17(c) motions implicates the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor. See Tomison, 969 F. Supp. at 593 (suggesting that "where evidence relevant to guilt or punishment is in a third party's possession and is too massive for the defendant to adequately review unless obtained prior to trial, pre-trial production through Rule 17(c) is necessary to preserve the defendant's constitutional right to obtain and effectively use such evidence at trial" (citing United

in Anderson we carefully distinguished "the record on which a judge actually decides the central issues in a case" from "documents presented to a judge in connection with a discovery dispute" -- precisely the type of documents at issue here. In re Boston Herald, 321 F.3d at 189 (construing Anderson, 805 F.2d at 13).

We note that even with respect to civil discovery, which does not implicate the same level of concern about revealing a criminal defendant's strategy, there is no right of public access. In Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984), the Supreme Court stated that "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice." Id. at 33 (footnote omitted). Following Seattle Times, the courts of appeals have uniformly held that the public has no common law or constitutional right of access to materials that are gained through civil discovery but neither introduced as evidence at trial nor submitted to the court as documentation in support of motions or trial papers. See, e.g., Anderson, 805 F.2d at 13; Bond v. Uteras, 585

States v. Murray, 297 F.2d 812, 821 (2d Cir. 1962))); cf. United States v. Porter, 988 F. Supp. 519, 525 (M.D. Pa. 1997) (relying in part on Sixth Amendment implications of Rule 17(b) determinations to find right of access). Even so, this is an insufficient ground for conferring a public right of access. See In re Boston Herald, 321 F.3d at 184 & n.6 (rejecting argument that constitutional implications of CJA eligibility determinations were sufficient to trigger right of access where defendant's eligibility for funding did not arise "in the core of [a] criminal proceeding[]").

F.3d 1061, 1073-77 (7th Cir. 2009); In re Alexander Grant & Co. Litig., 820 F.2d 352, 355 (11th Cir. 1987); Okla. Hosp. Ass'n v. Okla. Publ'g Co., 748 F.2d 1421, 1424-26 (10th Cir. 1984), cert. denied, 473 U.S. 905 (1985).  Consistent with this authority, we also have concluded that no right of access attaches to civil discovery motions themselves or materials filed with them.  See Anderson, 805 F.2d at 11-13.  Accord, Chi. Tribune Co. v. Bridgestone, 263 F.3d 1304, 1312-13 (11th Cir. 2001); Leucadia, Inc. v. Applied Extrusion Techs., Inc., 998 F.2d 157, 163-66 (3d Cir. 1993).[8]

In sum, no presumptive right of public access, based either in the common law or the First Amendment, attaches to the Rule 17(c) subpoenas or the related documents filed in connection with the underlying criminal prosecution in this case. Consequently, access may be obtained only upon a showing of special need.  Cf. United States v. Corbitt, 879 F.2d 224, 237-39 (7th Cir. 1989) (articulating showing required for disclosure of presumptively non-public pre-sentence report); United States v.

---

[8] Edwards' attempt to distinguish criminal discovery from its civil counterpart, by emphasizing that oversight of the use of Rule 17(c) subpoenas entails a level of court involvement that is absent in civil discovery, falls short.  It is true that, unlike civil discovery, in order to enforce a pre-trial subpoena against the government in a criminal case, a party must make a preliminary showing of relevance, admissibility and specificity.  Nixon, 418 U.S. at 700.  Even if this requirement applies to third party subpoenas, which is questionable, see Tomison, 969 F.Supp. at 593 n.14, the judge is not called upon to decide substantive issues but merely to manage the production of potential evidence.

Charmer Indus., Inc., 711 F.2d 1164, 1175-76 (2d Cir. 1983) (same). The district court was well within its discretion in concluding that the generalized interest proffered by Edwards failed to satisfy this standard. See, e.g., Charmer, 711 F.2d at 1177 (emphasizing that district court "of course has a fair measure of discretion" in determining whether person seeking disclosure has made an adequate showing of special need). We therefore affirm its order as applied to the Rule 17(c) materials.

**2.  Sentencing Memoranda**

Although we previously have not decided the precise question of whether advocacy memoranda, commonly submitted by the parties to the court in advance of sentencing, are "judicial records" entitled to a common law presumption of access, we have little doubt that they are. For starters, sentencing memoranda, which bear directly on criminal sentencing in that they seek to influence the judge's determination of the appropriate sentence, fall squarely into the category of materials that a court relies on in determining central issues in criminal litigation. We can discern no principled basis for affording greater confidentiality as a matter of course to sentencing memoranda than is given to memoranda pertaining to the merits of the underlying criminal conviction, to which we have found the common law right of access applicable. See In re Providence Journal, 293 F.3d at 11. Far from constituting a matter ancillary to adjudicatory proceedings,

-15-

see In re Boston Herald, 321 F.3d at 189-90 (excluding from the presumption Criminal Justice Act ("CJA") eligibility documents); Anderson, 805 F.2d at 13 (excluding documents presented to a judge in connection with a discovery dispute), sentencing is an integral phase in a criminal prosecution. Sentencing memoranda, which contain the substance of the parties' arguments for or against an outcome, are clearly relevant to a studied determination of what constitutes reasonable punishment. Thus, like substantive legal memoranda submitted to the court by parties to aid in adjudication of the matter of a defendant's innocence or guilt, sentencing memoranda are meant to impact the court's disposition of substantive rights.

Public access to sentencing memoranda is consonant with the values animating the common law right. "Access to judicial records and documents allows the citizenry to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system." Standard Fin. Mgmt. Corp., 830 F.2d at 410 (quoting In the Matter of Continental Ill. Secs. Litig., 732 F.2d 1302, 1308 (7th Cir. 1984)) (internal quotation marks omitted). The presence of such oversight serves several values when a court is called upon to exercise its discretion to impose a criminal sentence. See, e.g., In re Hearst Newspapers, L.L.C., 641 F.3d 168, 179 (5th Cir. 2011) (noting the importance of openness in sentencing given that "the court, rather than a jury, is

-16-

determining the sentence").  Public access in this context may serve to "check any temptation that might be felt by either the prosecutor or the court . . . to seek or impose an arbitrary or disproportionate sentence," In re Washington Post Co., 807 F.2d 383, 389 (4th Cir. 1986); promote accurate fact-finding, see, e.g., United States v. Alcantara, 396 F.3d 189, 198 (2d Cir. 2005); and in general stimulate public confidence in the criminal justice system by permitting members of the public to observe that the defendant is justly sentenced, see, e.g., In re Hearst Newspapers, 641 F.3d at 179-80.  These salutary effects of access to sentencing hearings also serve to support public access to sentencing memoranda.

Accordingly, sentencing memoranda are judicial documents subject to the common law presumption of public access.

### 3. Sentencing Letters

Edwards also claims a right of access to the sentencing letters submitted by third parties on the defendants' behalf.  A majority of these letters were included as attachments to the defendants' sentencing memoranda, although in Levitin's case additional letters were sent directly to the district court.  While there is not much case law on this issue, those courts that have addressed the question of whether there is a common law right of access to sentencing letters typically have said that there is.

-17-

There are obvious differences between third-party letters submitted to the court and sentencing memoranda. Such letters are often unguarded and informal, and they are frequently emotion-laden. But their purpose is not so different. Having concluded that the common law right of access attaches to sentencing memoranda, it is but a small step to also conclude that the right also extends to sentencing letters submitted in connection with those memoranda. As illustrated by the defendants' sentencing submissions in this case, such letters are central to, and serve as an evidentiary basis for, the defendants' arguments for leniency.

Here, Kravetz contended in her sentencing memorandum that her involvement in the criminal scheme was an aberration (related to mental health issues) from an otherwise law-abiding and productive life. In support of this contention, she relied primarily on letters from family members and friends. Levitin, also relying on letters from family members, friends and medical providers, argued that the sentencing court should take into account his difficult upbringing and serious medical conditions, his otherwise exemplary personal and work history, and Kravetz's manipulative behavior.

The letters on which the defendants' averments relied not only were submitted as attachments to their sentencing memoranda, but also were expressly referenced and, in many instances, directly

quoted in those memoranda.  The presumptive right of access plainly attaches to these letters, which the defendants utilized and asked the court to rely on in tailoring their arguments for leniency. See United States v. Kushner, 349 F. Supp. 2d 892, 900-02 (D.N.J. 2005) (reviewing cases addressing letters submitted at sentencing and concluding that "sentencing letters 'attached' to or referenced in [a] defendant's sentencing memorandum are invariably disclosed, as they are part of the public record"); cf. United States v. Dare, 568 F. Supp. 2d 242, 244 (N.D.N.Y 2008) (concluding that medical records filed by defendant as attachments to his sentencing memorandum were subject to public access); United States v. Sattar, 471 F. Supp. 2d 380, 385 (S.D.N.Y. 2006) (concluding that letter and attached psychiatric report transmitted by defendant's counsel to aid in sentencing were subject to public access).

The presumptive right of access is not limited to letters annexed to the parties' sentencing submissions.  Similar to them, letters sent directly to the court by third parties are meant to effect the judge's sentencing determination and thus "take on the trappings of a judicial document under the common law." United States v. Gotti, 322 F. Supp. 2d 230, 249 (E.D.N.Y. 2004); see also United States v. Libby, No. 1:05-cr-00394 (D.D.C. May 31, 2007) (No. 356); Kushner, 349 F. Supp. 2d at 906-911; United States v. Lawrence, 167 F. Supp. 2d 504, 509 (N.D.N.Y. 2001).  But see United States v. Boeksy, 674 F. Supp. 1128, 1130 (S.D.N.Y. 1987).  There

-19-

is, to be sure, a legitimate concern that the routine disclosure of third-party letters may discourage valuable input from the community during the sentencing process. See, e.g., Kushner, 349 F. Supp. 2d at 908-09. To the extent that such a concern might be said to weigh against a general recognition of a presumption of access to this category of documents, see, e.g., Leucadia, Inc., 998 F.2d at 164-65 (weighing prudential considerations in determining applicability of common law right of access (citing Anderson, 805 F.2d at 12)), that concern ordinarily would appear to be outweighed by positive gains. Cf. In re Globe Newspaper Co., 920 F.2d 88, 91 (1st Cir. 1990) ("In a democracy, criminal trials should not, as a rule, be decided by anonymous persons.").

The defendants offer only one reason why at least some of the sentencing letters should not be considered judicial documents: "because it is unclear whether the court relied upon them." Pointing to the shorthand definition of "judicial documents" that we sometimes use, see, e.g., Standard Fin. Mgmt. Corp., 830 F.2d at 408 (describing such documents as those "on which a court relies in determining the litigants' substantive rights" (emphasis added) (quoting Anderson, 805 F.2d at 13)), the defendants appear to suggest that sentencing letters can be made part of the public record only when it is first established that they "affect[ed] the sentence."

This argument is foreclosed by Standard Financial Management. There, we explicitly rejected an approach to public access that would turn on whether the documents at issue actually played a role in the court's deliberations. Instead, we held that documents relevant to the determination of the litigants' substantive rights that came to the attention of the district judge could "fairly be assumed to play a role in the court's deliberations." Id. at 409. "To hold otherwise would place us in the position of attempting to divine and dissect the exact thought processes of judges . . . ." Id. "To avoid the necessity for such mindreading," we held there, and reaffirm here, "that relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of access applies." Id.; see also Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 123 (2d Cir. 2006) ("If the rationale behind access is to allow the public an opportunity to assess the correctness of the judge's decision . . . documents that the judge should have considered or relied upon, but did not, are just as deserving of disclosure as those that actually entered into the judge's decision." (quoting In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 101 F.R.D. 34, 43 (C.D. Cal. 1984))). Like the letters compiled and submitted by defendants' counsel, the letters

-21-

submitted directly to the court on Levitin's behalf are presumptively accessible.[9]

## B.  PROCEDURAL CLAIMS

"Though the public's right of access is vibrant, it is not unfettered.  Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." Siedle, 147 F.3d at 10 (citing Standard Fin. Mgmt., 830 F.2d at 410); see also Nixon v. Warner Commc'ns, 435 U.S. 589, 598 (1978) ("It is uncontested . . . that the right to inspect and copy judicial records is not absolute.").  When addressing a request to unseal, a court must carefully balance the presumptive public right of access against the competing interests that are at stake in a particular case, see id., keeping in mind that "'only the most compelling reasons can justify non-disclosure of judicial records' that come within the scope of the common-law right of access." In re Providence Journal, 293 F.3d at 10 (quoting Standard Fin. Mgmt., 830 F.2d at 410).  Edwards makes two procedural claims.  He first objects that the public docket did not accurately reflect all sealed motions and documents and thus deprived the public of the notice necessary to oppose closure.  He also objects that the

---

[9]  We do not hold that an irrelevant document, that neither was nor should have been relied on, is nevertheless a judicial document and thus necessarily presumptively subject to disclosure. But a document submitted to a court for the purpose of influencing and adjudicatory proceeding ordinarily would be subject to the presumption.

-22-

district court did not make particularized findings of fact in support of its decision to seal the records at issue.

Taking up these claims, the government points to provisions of the local rules of the United States District Court for the District of Massachusetts that require a party seeking to seal documents to file a motion with the district court "each time a document or group of documents is to be filed," D. Mass. R. 7.2(e), and to accompany such motion with "a memorandum of reasons, including citation of supporting authorities" as well as "[a]ffidavits and other documents setting forth or evidencing facts on which the motion is based," id. at 7.1(B)(1). Although agreeing with Edwards that potentially interested parties should generally be able to determine from the court's docket that a motion to seal or a sealed document has been filed, the government argues that in the usual case a reviewing court will be able to infer the district court's findings from the contents of the motions, thereby obviating the need for the issuance of specific findings every time a document is sealed. Additional procedural requirements, it argues, would be burdensome and impractical.

It is axiomatic that protection of the right of access suggests that the public be informed of attempted incursions on that right. Providing the public with notice ensures that the concerns of those affected by a closure decision are fully considered. Cf. In re Hearst Newspapers, 641 F.3d at 182 (noting

-23-

that the courts of appeals have uniformly required that notice and an opportunity to be heard be given prior to the sealing of documents to which a right of access attaches) (collecting cases). "[S]afeguards that will protect the [access] rights of the public, without unduly interfering with the workings of the judicial process," Washington Post v. Robinson, 935 F.2d 282, 289 (D.C. Cir. 1991), include a docket entry that a motion to seal has been filed. See generally Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 93 (2d Cir. 2004) ("[D]ocket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity to exercise their [access] rights . . . ."). Because, as the government notes, such motions frequently discuss in some detail the material sought to be sealed, leave of court may be requested to file the text of the motion and any supporting materials under seal pending the district court's disposition of the motion.  E.g., Robinson, 935 F.2d at 289.  That disposition ordinarily is also reflected on the docket sheet but may, in appropriate circumstances, be sealed.  E.g., id.

We have reviewed thoroughly the record in this case and find Edwards' concerns regarding the failure to docket to be unsubstantiated.  Although Edwards surmises that "there are numerous secret sealed documents which do not appear on the public docket at all," comparison of the entire record with the public

docket reveals that, with limited exception, the documents in this case were reflected on the docket sheet.[10]

Edwards' second procedural claim is more substantial, as the district court did not make particularized findings to support the decision to seal. "Appellate courts have on several occasions emphasized that upon entering orders which inhibit the flow of information between courts and the public, district courts should articulate on the record their reasons for doing so." In re Associated Press, 162 F.3d 503, 510 (7th Cir. 1998). Those reasons must be specific enough to permit a reviewing court to determine whether sealing was appropriate. Cf. Press-Enter. Co. v. Superior Courts, 464 U.S. 501, 510 (1984). The district court's one sentence justification for the continued sealing here, intended to apply to several documents filed by different parties at different times, falls short.

Often, as the government argues, the court's justification for sealing may be inferred from the substance of the parties' motions. But this is not such an instance. Kravetz's sentencing memorandum appears to have been filed directly under

---

[10] The bulk of the documents for which the public docket contained no entry were as-yet-unedited and therefore private stenographer files. Although two presumptively accessible documents were not reflected on the public docket -- specifically, Levitin's sentencing memorandum and the court's docket-entry order allowing that memorandum to be filed under seal -- the public was nonetheless provided with notice of a potential sealing by virtue of the docketing of the sealed motion to seal the memorandum.

seal without an accompanying motion setting forth the basis for sealing, and her subsequent blanket statement that the materials were "personal to her" did not compensate for that deficiency. Levitin, although complying with the letter of the local rules, stated in his motion to seal only that his sentencing submissions contained "intimate personal information regarding his childhood, health, and certain case-related events." Although general references such as these offer some insight into a court's decision to seal, they are in this case inadequate substitutes for the more detailed explanation that the law requires. See Standard Fin. Mgmt. Corp., 830 F.2d at 412 (emphasizing that sealing of judicial documents "must be based on a particular factual demonstration of potential harm, not on conclusory statements" (quoting Anderson, 805 F.2d at 7)). The defendants' statements, standing alone, do not provide a sufficient basis to preserve the sealing order.

## C. REMAND

Although we conclude that the district court was required to state with greater specificity its reasons for denying Edwards' motion to unseal, we reject Edwards' proposed remedy for its failure to do so. Citing our decision in In re Globe Newspaper Co., Edwards argues that the absence of particularized findings requires the immediate unsealing of the relevant documents. In In re Globe, we held that "given the absence here of particularized findings reasonably justifying non-disclosure, the juror names and

-26-

addresses must be made public." 920 F.2d at 98. That statement must be read in context, however. We made clear that we deemed disclosure to be appropriate in that case only after determining that neither "the juror's individual desire for privacy" nor "the judge's general belief that . . . it would be better to keep the names and addresses private" constituted permissible grounds for withholding jurors' identities from the public, and only after noting the parties' concession that no special circumstances, such as concern for the personal safety of jurors, were present to justify non-disclosure. Id.

Unlike in In re Globe, the appropriate remedy in this case is for the district court, in the first instance, to determine whether the parties have offered sufficient justification for sealing, and to articulate the reasons for its decision. See Siedle, 147 F.3d at 10 ("The trial court enjoys considerable leeway in making decisions of this sort. Thus, once the trial court has struck the balance, an appellate court will review its determination only for mistake of law or abuse of discretion.").

Our decision to remand requires that we address the parties' disputes about the law governing the analysis that the district court is to employ. In describing the limitations of the public's common law right of access in Nixon v. Warner Communications, the Supreme Court emphasized that "[e]very court has supervisory power over its own records and files, and access

has been denied where court files might become a vehicle for improper purposes." 435 U.S. at 598. As non-exhaustive examples of documents to which courts had denied public access, the Court referenced "records . . . used to gratify private spite or promote public scandal" and "business information that might harm a litigant's competitive standing." Id. (quotation marks and citations omitted) (collecting cases).[11] The defendants argue that their own and third-party personal and business privacy interests justify withholding broad swaths of the documents at issue from public view.

### 1. Third-Party Personal Privacy Interests

The defendants first argue that the personal privacy interests of third parties warrant the non-disclosure of several of the sentencing letters and the redaction of identifying information from all others. They assert that the third parties who submitted letters on the defendants' behalf did so "in the expectation of privacy" -- an expectation that they suggest defense counsel fostered by promising that the documents would be filed under seal. It is self-evident that counsel may not make any such binding assurances about how a court would view such documents.[12] The

---

[11] The defendants intimate that we should consider Edwards' "behavior and motives," but the record does not suggest any improper purpose.

[12] This is not to say, of course, that a court is prohibited from considering the understanding that a letter-writer has about the likely confidentiality of the letter to the court.

-28-

defendants say that, in any event, various letters contain personal information which, if published, would impermissibly intrude upon the privacy rights of the authors and other third parties.

"[P]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records." Standard Fin. Mgmt. Corp., 830 F.2d at 411 (quotation marks omitted); accord In re Boston Herald, 321 F.3d at 190-91. Third-party privacy interests, in particular, have been referred to as "a venerable common law exception to the presumption of access," United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1051 (2d Cir. 1995), and "weigh heavily in a court's balancing equation," id. at 1050 (internal alterations and citation omitted).

Thus, we have said that courts should "consider the degree to which the subject matter is traditionally considered private rather than public." In re Boston Herald, 321 F.3d at 190 (quoting Amodeo II, 71 F.3d at 1051). "Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." 71 F.3d at 1051. Furthermore,

> [t]he nature and degree of injury must also be weighed. This will entail consideration not only of the sensitivity of the information and the subject but also of how the person seeking access intends to use the information. Commercial competitors seeking an advantage

-29-

> over rivals need not be indulged in the name of monitoring the courts, and personal vendettas similarly need not be aided. The court should consider the reliability of the information. Raw, unverified information should not be as readily disclosed as matters that are verified. Similarly, a court may consider whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein.

Id.

Applying this framework to the third-party personal privacy interests asserted here, we note that some of the letters contain discussion of the ill health of members of the authors' families, incidents of domestic violence, and other domestic relations matters. This information is highly personal and appears to have no direct bearing upon the public's assessment of the sentences imposed. Under these circumstances, the privacy interests implicated by disclosure may overcome the presumption of public access. See, e.g., Kushner, 349 F. Supp. 2d at 908; Gotti, 322 F. Supp. 2d at 250; Boesky, 674 F. Supp. at 1129.

Whether the balance of interests justifies withholding from the public the identity of the authors, or the entire content of each of the relevant letters, is a matter to be decided by the district court. We note only that, where the public's right of access competes with privacy rights, "it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document." United States v. Amodeo ("Amodeo I"), 44 F.3d

-30-

141, 147 (2d Cir. 1995); cf. In re Providence Journal, 293 F.3d at 15 (holding, in context of documents to which First Amendment right of access attaches, that "[r]edaction constitutes a time-tested means of minimizing any intrusion on that right").

### 2. Defendants' Personal Privacy Interests

The defendants also argue that their own privacy interests justify the redaction of numerous additional documents. Much of the information that the defendants seek to redact pertains to personal medical matters, including details of Levitin's physical health and mental health issues experienced by Kravetz. The defendants argue that release of this "entirely private" information "can have no legitimate purpose" and will, in fact, result in "irreparable harm." On similar grounds, they argue that information relating to personal and family history should be withheld from public view.

Medical information is, as intimated above, "universally presumed to be private, not public." In re Boston Herald, 321 F.3d at 190. Acknowledging the presumptively private nature of medical information does not end the matter, however. The privacy interest in medical information is "neither fundamental nor absolute," Sattar, 471 F. Supp. 2d at 387 (citing, inter alia, Whalen v. Roe, 429 U.S. 589, 603-04 (1977)), and can be waived or otherwise overcome by a variety of means. See generally Crawford v. Manion, No. 96 Civ. 1236 (MBM), 1997 WL 148066, at *1-2 (S.D.N.Y. Mar. 31,

-31-

1997).  In this case, Edwards argues that the defendants should be deemed to have waived their right to privacy in the medical information at issue by having voluntarily submitted it to the court in an attempt to mitigate their sentences.

We are sensitive to the fact that medical documentation such as that at issue here may contain information beyond the diagnosis and treatment information that is likely to form the basis of a plea for or grant of leniency.  Medical records, for example, frequently include "the details of a person's family history, genetic testing, history of diseases and treatments, history of drug use, sexual orientation and practices, and testing for sexually transmitted diseases."  U.S. Congress, Office of Technology Assessment, Protecting Privacy in Computerized Medical Information, OTA-TCT-576 (Sept. 1993).  In addition, "[s]ubjective remarks about a patient's demeanor, character, and mental state are sometimes a part of the record."  Id.  Disclosure of this peripheral information may only serve to "gratify private spite or promote public scandal."  Nixon, 435 U.S. at 598 (quoting In re Caswell, 29 A. 259, 259 (R.I. 1893))(internal quotation mark omitted); see also Amodeo II, 71 F.3d at 1051 ("Courts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure" (quoting In re Caswell, 29 A. at 259) (internal quotation marks omitted)).  We note again that redaction remains a viable tool for separating this

-32-

information from that which is necessary to the public's appreciation of the sentence imposed.

Levitin's claim of privacy in his medical records, however, may lose some force in light of his prior publication of the information that he now seeks to protect. See Cox Broad. Corp. v. Cohn, 420 U.S. 469, 494-95 (1975) ("[T]he interests in privacy fade when the information involved already appears on the public record."); Globe Newspaper Co. v. Pokaski, 868 F.2d 497, 506 n.17 (1st Cir. 1989) (noting that "prior publicity weighs strongly against sealing"). In his public sentencing hearing, he articulated not only the full panoply of ailments from which he suffers, but also the dire predictions for his health should he fail to take immediate steps to improve his condition.

### 3. Business Interests

The final argument in favor of non-disclosure, unique to Levitin's submissions, pertains to information about his business interests and business associates who wrote letters on his behalf. The harm claimed, potential "guilt by association," is without substantiation, see Nat'l Org. for Marriage v. McFee, 649 F.3d 34 (1st Cir. 2011) (refusing to credit unsubstantiated allegation of privacy concerns relating to the disclosure of business relationships), cert. denied, 132 S. Ct. 1635 (2012), and is little more than a fear of adverse publicity, which is insufficient to defeat public access. E.g., Siedle, 147 F.3d at 10; Cent. Nat'l

Bank of Mattoon v. United States Dep't of Treasury, 912 F.2d 897, 900 (7th Cir. 1990); Brown & Williamson Tobacco Corp. v. F.T.C., 710 F.2d 1165, 1179-80 (6th Cir. 1983).

**III.**

For the reasons provided herein, we **affirm in part** and **vacate in part** the district court's order denying Edwards' motion to unseal records in the underlying criminal case and **remand** for further proceedings consistent with this opinion.

The parties shall bear their own costs.